AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

APR - 9 2018

JULIA C. DUDLEY, CLERK
BY: /s/ A. Blaylock
DEPUTY CLERK

United States of America
v.
Christy Santiago

Case No. 2:18mj19

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May 23, 2015__ in the county of __Lee__ in the
__Western__ District of __Virginia__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S. Code, Section 841(a)(1) and 841(b)(1)(E) | Knowingly or intentionally distributed, and possessed with intent to distribute, Buprenorphine, a Schedule III controlled substance. |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Paul K. Gray, FBI Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: 4/9/18

_____
Judge's signature

City and state: Abingdon, Virginia

Pamela Sargent, United States Magistrate Judge
_____
Printed name and title

## AFFIDAVIT

### Introduction

1) I, Paul K. Gray, am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been such for the past 28 years. My duties, both past and present, involve the investigation of violent crimes, which include the investigation of drug gangs and illegal narcotics investigations. During my employment with the FBI, I have received training and conducted numerous investigations involving illegal narcotics and controlled substances. Additionally, since February 2013, I have participated in numerous criminal investigations involving inmate offenders confined at the United States Penitentiary – Lee, located in Lee County, Virginia (USP-Lee), as well as their civilian visitors. USP-Lee is located in the Western Judicial District of Virginia.

2) Since this affidavit is being submitted only for the limited purpose of securing authorization for an arrest warrant, I have not included each and every fact which is known to me concerning this investigation. Rather, I have set forth only those facts that are believed to be necessary to establish probable cause to secure an arrest warrant for Christy Santiago (DOB 11/01/78). Facts not set forth herein are not being relied upon in reaching the conclusion that an arrest warrant should be issued. Nor is it requested that the Court rely upon any facts not set forth herein in reviewing this affidavit.

3) The statements contained in this affidavit are based on information provided by officials employed at USP-Lee, as well as my own observations, investigation, and background as an FBI SA. This affidavit is being submitted in support of a criminal complaint to arrest Christy Santiago. I have set forth the facts that I believe are necessary to establish probable cause to believe Christy Santiago violated Title 21, United States Code, Section 841(a)(1) and (b)(1)(E) at USP-Lee.

### Background

4) Victor Labron (Inmate# 25168-038) is an inmate serving a federal sentence within the U.S. Bureau of Prisons (US-BOP). In 2015, Labron was incarcerated in USP-Lee.

5) On the morning of 5/23/2015, Christy Santiago entered USP-Lee's front lobby at which time she signed the prison's "Inmate Visitor's Log" and provided Victor Labron's name and inmate number as

the inmate she intended to visit. She also completed an official United States Bureau of Prisons (US-BOP) "Notification to Visitor" form (BOP form AO224). Upon this form Santiago advised of the inmate she intended to visit as being Victor Labron, and she also provided his inmate number. Santiago completed the form by signing it and answering "no" to all of the questions relating to her possessing unauthorized items, to include narcotics. After completing this form, Santiago then proceeded to the prison's visitation room, at which time she visited with Labron. Video surveillance cameras at USP-Lee also captured Santiago entering the prison. Santiago is the only visitor Labron met with on this date.

6) At the end of the above visit in the early afternoon of the same date, Labron was escorted by USP-Lee personnel from the visitation room and ordered to submit to an electronic body scan. Upon his refusal, Labron was then escorted to USP-Lee's medical unit at which time he was placed into a "dry cell" (cell containing no toilet). USP-Lee Special Investigative Services (SIS) personnel advised me that on 5/25/2015, Labron defecated 2 rubber balloons which contained a total of 50 orange strips having "N8" markings on them. A subsequent field test of these strips conducted by the SIS yielded positive results for Opium Alkaloids. I subsequently accepted custody of these 50 strips and submitted them for further examination at the Drug Enforcement Agency (DEA) Laboratory. A DEA Laboratory report provided to me in December, 2015 regarding the examination of these strips revealed the strips to be Buprenorphine (commonly referred to as Suboxone) (a schedule III controlled substance).

7) USP-Lee inmates may be permitted to correspond with certain US-BOP approved individuals via an e-mail system strictly operated and maintained by the US-BOP via the prison's TRULINCS System. All inmate e-mail activity is stored and accessible to certain US-BOP personnel, to include SIS. Inmates have no expectation of privacy and their e-mail activity can be examined and monitored at any time by certain US-BOP personnel, without the consent of the respective inmate. Inmates also have no expectation of privacy regarding the phone calls they are allowed to make from USP-Lee, and these calls, which are recorded, can be examined and monitored at any time by certain US-BOP personnel, to include USP-Lee SIS personnel, without the consent of the respective inmate.

8) The experience and knowledge I have gained through investigating illegal prison narcotics cases has taught me that inmates will use coded language when e-mailing or phoning others to talk about narcotics.

9) Subsequent to the above USP-Lee visit on 5/23/2015 by Santiago and Labron, USP-Lee SIS personnel provided to me copies of electronic mail (e-mails) they had captured between Santiago and inmate Labron via the BOP's "Trulincs" inmate e-mail system. It was observed by me that Santiago communicated with Labron via her e-mail address christina3victor@yahoo.com. Several of these messages were highlighted by SIS and read by me. The SIS investigator who highlighted the messages has had a lengthy experience of investigating illegal drug cases with the FBI at USP-Lee for several years, and has developed a skill at discovering and interpreting inmate coded e-mails as they relate to illegal drug matters. On 5/16/2015, a message from Labron to Santiago was captured in which Labron appears to be advising that at least "33" strips of Suboxone are needed in order to make a profit from the intended distribution of this drug. Labron's message contains coded language through which he states,

"U know what baby tell her to 4get it for rite now n holla at jolly but she has to make it more at least 33 for her bc (because) a score of 25 isn't enuff for the grade A. I mean it's good but she won't get that much payment bc (because) that job requires hig (big) expectations feel me?"

10) On 5/10/2015, Labron and Santiago e-mailed each other at which time Labron requested that Santiago accept $50 from an inmate and that this money be forwarded to some individuals in Puerto Rico. I have learned from USP-Lee SIS personnel that prescription drugs such as Suboxone are generally purchased by inmates through third parties from Mexico and Puerto Rico due to their lower cost. The text of their conversation is as follows:

Labron: "how u been bby. Babe I need u to accept dude he goin to send 50 n I need it to pr (Puerto Rico) reg mail ok plz (please) its import."
Santiago: "I accepted...Send to PR (Puerto Rico) where?"
Labron: "RR2 PO Box 1499 Cupey Bajo, Cupey PR 00926"
Santiago: "Ok baby"
Labron: "let me know if that came from my town or if u got my mail"
Santiago "Never mind I got another message for another 50"

11) While investigating illegal drug cases at USP-Lee, I have learned that civilian visitors will sometimes purchase food from the vending machines located in the prison's visitation room and then place illegal drugs into the food to conceal them. The civilian will then give the food containing the drugs to the inmate for his consumption, and the inmate will then defecate the drugs in his cell at a later time for distribution inside the prison. On 5/22/2015, the day before their visitation, some of Santiago and Labron's messages contain coded language through which they appear to be discussing how to pass the

narcotics to Labron at the prison. The actual text of these messages are as follows:

| | |
|---|---|
| Santiago: | "I need to know what u want to eat/drink tho baby" |
| Labron: | "I drink only water or juice. I like candy lol (laugh out loud). U know Chicken sandwich chips or chocolate." |
| Santiago: | "Ok" |
| Labron: | "heard there's no sandwich lol (laugh out loud)" |
| Santiago: | "Ok ☹" |
| Labron: | "we'll fig (figure) it out." |
| Santiago: | "Ok" |
| Labron: | "u know we will" |
| Santiago: | "We always do." |

12) USP-Lee SIS personnel and I reviewed a telephone call between Santiago and Labron that had been recorded by USP-Lee's phone system on 6/06/2015. This call was made by Labron while incarcerated in USP-Lee's Special Housing Unit (HU), and was the first call he had been allowed to make to Santiago subsequent to refusing the body scan and defecating the balloons in May, 2015. During this call, Labron appears to be telling Santiago that he had not concurred with his above prison body scan and stated that he "wasn't sure what it was gonna be like". Some of the actual text of this phone call by Labron is as follows:

| | |
|---|---|
| Labron: | "I denied that shit though, you know what I mean?" |
| Santiago: | "Yeah" |
| Labron: | "Cause I didn't know that they just started doing it.....You know everything was all good?" |
| Santiago: | "Yeah" |
| Labron: | "But, I didn't know what it was actually gonna be like. I just said fuck it....I'm in the SHU, probably gonna get transferred......I think I coulda beat it, but I didn't know like the next day what was gonna happen, so I just said fuck it, I just bucked up, just said naw..." |

13) In September, 2015 I, along with USP-Lee SIS personnel, interviewed Labron at USP-Lee regarding his possession of the above Suboxone (Buprenorphine). During this interview, Labron advised that he had been in possession of the Suboxone prior to Santiago's visit with him at USP-Lee on 5/23/2015, and he had obtained the drugs from an unknown inmate in the prison's compound yard approximately 2 days prior to her visit. He advised that Santiago's visit was a "surprise visit", and when she arrived at USP-Lee, he went directly from the prison's yard to the visitation room. He further advised that he swallowed the drugs just prior to visiting with Santiago. Labron stated that he did not put the drugs in his cell prior to the visit because he did not want his cellmate to "get caught with them and get in trouble".

14) The experienced USP-Lee SIS official, referred to in the above paragraph# 9, who assisted me with investigating this matter advised that "pat searches" of inmates are conducted in the prison each day throughout the prison, to include the yard and cellblocks. He advised that it is not normal for an inmate to carry balloons of drugs on their person around the prison yard and not put them in their cell. He advised that during his 16 years of working at the prison, both as a correctional officer and an SIS officer, there has never been a "pat search" of an inmate in which an inmate had balloons of drugs on their person, and balloons are usually received and swallowed by the inmate via visitation with civilian visitors prior to the inmate leaving the visitation room. He further advised that if drugs are found on an inmate's person, the drugs found have been downsized by the inmate from a balloon size to a smaller "sellable" weight.

15) In the summer of 2017, I served subpoenas for the records related to Christy Santiago's financial accounts. The subpoenaed records included information from Santiago's Wells Fargo and Bank of America bank accounts, as well as records from the Moneygram and Western Union companies. An analysis of these records by an FBI Financial Analyst revealed that from May, 2015 through December, 2016, Santiago sent, via Moneygram wire transfers, $3,682.95 from her Bank of America account to 14 US-BOP inmates, to include Victor Labron. During this timeframe, Santiago also wired $589.65 to Georgia Department of Corrections inmates. Also during this timeframe it was discovered that Santiago received, via Moneygram wire transfers, $1,348.85 from 12 US-BOP inmates, to include Labron. This analysis also revealed that from November, 2016 through May, 2017, Santiago sent, via Western Union wire transfers, $322 to unknown US-BOP inmates.

16) My training and experience of investigating narcotics through the years has taught me that individuals involved in the trafficking of illegal drugs will exchange money on numerous occasions.

17) In September, 2017 I served a search warrant on the Yahoo e-mail company for the contents of messages related to Santiago's above e-mail account christina3victor@yahoo.com. A message from this account dated April 29, 2015 to recipient semihefa@yahoo.com contained instructions to the recipient on how to mail Suboxone to a USP-Lee inmate via concealing the drugs in a book store purchased "GQ" magazine that could be mailed to the inmate via the book store subsequent to concealing the Suboxone in the cologne art pages contained in the magazine.

18) My years of investigating illegal drug cases at the USP-Lee have revealed that concealed illegal drugs are sometimes distributed to inmates inside magazines and/or books via the U.S. Mail.

19) On November 20, 2015 Christy Santiago was interviewed by personnel from the Atlanta, Georgia FBI Office. During this interview, she advised that she did visit inmate Labron during May, 2015. She advised that she had "never heard of" Suboxone, but also advised that she used to be a "Pharmacy Technician". On February 24, 2016, Santiago was again interviewed by Atlanta FBI personnel at which time she advised that she had "sent" inmate Labron "approximately $200 total". Details contained in the above FBI financial analysis reveal that Santiago wired Labron via Moneygram a total of $777.70. During this interview, Santiago also advised that she was unemployed and had not worked since 2009.

**CONCLUSION**

20) Based on the above facts, I believe there is probable cause to believe that Christy Santiago did knowingly or intentionally distribute, and possess with intent to distribute, Buprenorphine, a Schedule III controlled substance.

Paul K. Gray
Special Agent
Federal Bureau of Investigation

Read and Approved:
_____, AUSA

Subscribed and sworn to before me on this ___9th___ day of April, 2018 at Abingdon, Virginia.

Pamela Sargent
UNITED STATES MAGISTRATE JUDGE